UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

Eastern District of Kentucky
F I L E D

JUN 2 3 2005

AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

CIVIL ACTION NO. 04-233-GWU

WANDA WATTS,                                                    PLAINTIFF,

VS.                          **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,                    DEFENDANT.

* * * * * * * *

The plaintiff appeals an administrative decision to terminate Disability

Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits originally

awarded in 1992. The case is currently before the Court on cross-motions for

summary judgment.

**STANDARDS APPLICABLE TO TERMINATION DECISIONS**

When the issue is the termination of benefits, the Regulations establish the

following eight-step test:

1.  Is the beneficiary engaging in substantial gainful
    activity? If so, then the disability will be found to have
    ended. See 20 C.F.R. Section 404.1594(f)(1).

2.  Provided the beneficiary is not engaged in substantial
    gainful activity, does the beneficiary have an
    impairment or combination of impairments which meet
    or equal the severity of impairments in the Listing? If
    so, then the disability must be found to continue. See
    20 C.F.R. Section 404.1594(f)(2).

1

Watts

3.  If the beneficiary does not equal a listing, then the question is whether there has been medical improvement (any decrease in the medical severity of one's impairments, as per 20 C.F.R. 404.1594(b)(1)).

4.  Provided medical improvement has occurred, then the question is whether this has produced an increase in the residual functional capacity. If the improvement is not related to the ability to perform work activities, then one proceeds to step 5. If the improvement is related work ability, then one proceeds to step 6. See 20 C.F.R. Section 404.1594(f)(4).

5.  Provided there has been no medical improvement or the improvement is not related to work ability, then one must decide whether an exception to the medical improvement standard will apply. If not, then a finding of continuing disability should be made. See 20 C.F.R. Section 404.1594(f)(5).

6.  If the medical improvement is found to be related to work ability or if an exception to the medical improvement standard applies, then one considers whether the current impairments in combination are severe. If so, then one proceeds to step 7; if not, the beneficiary is no longer considered disabled. See 20 C.F.R. Section 404.1594(f)(6).

7.  If the impairments are found to be severe, then one must assess the beneficiary's ability to engage in substantial gainful activity in accordance with 20 C.F.R. Sec. 404.1561. If found capable of performing past relevant work, then the disability will be found to have ended. Otherwise, one proceeds to step 8. See 20 C.F.R. Section 404.1594(f) (7).

8.  Provided the beneficiary cannot perform past relevant work, then one must assess the residual functional capacity and considering the age, education, and past work experience, determine whether other work can be performed. If so, then the beneficiary is no longer disabled. Otherwise, a finding of continuing disability should be made. See 20 C.F.R. Section 404.1594(f)(8).

The standard for judicial review is whether there is substantial evidence to support the Secretary's decision that the plaintiff's condition has improved to the

2

extent that he can perform substantial gainful activity. Casiano, Jr. v. Heckler, 746
F. 2d 1144 (6th Cir. 1984). The Court must determine from the record upon what
conditions the claimant was awarded benefits, and whether there has been any
improvement in these conditions. Id. at 1148.

## DISCUSSION

Watts originally had been awarded benefits in 1992. The decision of the
administrative law judge (ALJ) indicated that the plaintiff had been found to have
been disabled since April, 1991 on the basis of "severe neck pain and thoracic
outlet syndrome." (Tr. 283). A later-issued Disability Determination Rationale had
cited a diagnosis of only "thoracic outlet syndrome." (Tr. 288).

The early medical evidence predating the award documented that the plaintiff
had been referred to a specialist in 1991 by her family doctor after she voiced
complaints of right upper extremity and shoulder pain. (Tr. 103). The specialist had
determined that she had degenerative changes of the cervical and lumbar spine as
established by CT scan or standard x-ray (Tr. 107-108) and that an abnormal EMG
study had been suggestive of cervical radiculopathy on the right (Tr. 112). Muscle
spasm of the cervical area and mild swelling in the right wrist were detected. (Tr.
114). Because of MRI findings possibly suggestive of herniated discs as well as
continued complaints of right arm pain, the patient was referred to a specialist. (Tr.
115-118). Vascular laboratory tests then revealed there had been only minimal

3

blood flow through the brachial vein (Tr. 120), suggestive of old brachial vein thrombosis or thoracic outlet syndrome (Tr. 126). Her surgeon believed that the arterial studies were highly suggestive of thoracic outlet syndrome, probably greater on the right, but also involving the left side. (Tr. 209). A right first rib resection was performed (Tr. 140-143) which improved the color and pain in her arm but left her still suffering from neck and shoulder pain, with mild to moderate spasms in the cervical spine (Tr. 127). Winging of the scapula, a possible complication from the surgery,[1] developed and due to the recurrence of arm symptoms, her neurologist planned to discuss her "complex problems" with another specialist as well as obtain a repeat MRI of the cervical spine. (Tr. 128). Her surgeon noted shortly thereafter that the patient still had a "considerable amount of symptoms," including more symptoms on the left. (Tr. 207). Arterial studies showed probably improved arterial flow on the right side (except distally), but possible deterioration on the left. (Tr. 212).

In May, 1992, one specialist had declared that the plaintiff exhibited pain, muscle spasms, significant limitation of motion in the spine and significant sensory loss (Tr. 163). He had proscribed her past work activity, and declared that she could not engage in activities such as doing "sustained work in a seated position for

---

[1]This was noticed by her family doctor as well who noted atrophy of the muscles around it and signs of pain upon motion. (Tr. 172).

4

6 to 8 hours per day," stand 6 to 8 hours per day "while working with arms and hands, operating hand/or foot controls" or doing "sustained clerical or sales work," and "relate with coworkers and stand up to the stress of engaging in productive work activity." (Tr. 161). The next month her family doctor had ascribed even greater restriction (Tr. 167) which he attributed to "degenerative disc disease and . . . chronic pain [despite surgery for thoracic outlet syndrome] making it difficult to use upper extremities" (Tr. 168). He had later filled out another form indicating the plaintiff could not perform even full-time sedentary work due to a number of conditions, most especially chronic pain. (Tr. 276). It had been at this point that the plaintiff had been awarded benefits.

During the 1990s,[2] the medical evidence appeared to contain some suggestion of medical improvement and some suggestion of an ability to perform sedentary level work. Surgeon Edward Todd felt that most of her symptoms were now related to cervical disc disease, rather than her primary condition, the thoracic outlet problems (Tr. 387). She had definite trapezius muscle spasm and some decreased pulse on the left side, but not nearly as limiting as the right had been,

---

[2]A Continuing Disability Review was performed in August, 1997, according to the ALJ (Tr. 17). The actual agency findings were not included from this later Comparison Point, with which to measure the plaintiff's subsequent status. The Commissioner, by her brief, is apparently only arguing that the 1992 date should be used as the Comparison Point. Brief, Docket Entry No. 11, at p. 4. The plaintiff does not even mention the 1997 review in her Statement of Facts. Brief, Docket Entry No. 10, at p. 1-2.

5

according to the doctor. (Tr. 392). Thus, Todd suggested that the primary condition had improved and, to the extent he referred to other problems, he did not issue a functional capacity assessment and, in fact, deferred analysis of any neurological problem to others (Tr. 387). Richard Sheridan opined in April, 1996 that despite her chronic strains, chondromalacia of the left patella and status post thoracic outlet syndrome, the plaintiff could do a full range of sedentary level work. (Tr. 406). Her family physician indicated the next year that her condition was worse (Tr. 409) and had indicated in a June, 1996 progress note that the plaintiff's chronic pain syndrome had been present for years with no improvement and that she had "marked stiffness in the neck as usual" as well as restricted motion of the neck and lumbar area and pain in the shoulders; he opined that her problem was "disabling." (Tr. 447). Nevertheless, as is noted by the defendant , the same doctor noted in one of his 1999 progress notes that Watts was "doing pretty well" (Tr. 431), which did suggest improvement.   Non-examining medical reviewers suggested higher functional capacity in assessment forms. Thus, when taken as a whole, the material from the 1990s suggested that the plaintiff's primary medical complaint had improved and, to the extent an opinion was offered, that the plaintiff  could now work at some level.

The current benefits cut-off date selected was January, 2001.  (Tr. 24-25). The ALJ opined that there had been an overall improvement in Watts' functioning

6

between either 1992 or 1997 and the selected termination date. (Tr. 22). He found that she had medically improved to the point that she was able to perform a limited range of light level work and that, as such, she could perform not only her past work as a floral designer but also a significant number of other jobs. (Tr. 22-24).

In finding that there had been medical improvement in Watts' physical condition, the ALJ relied, in part, on the examination of Martin Fritzhand. (Tr. 18-22). Fritzhand noted that all range of motion and manual muscle testing with the right upper extremity was associated with ratchety giveway response and rigidity, the Achilles tendon reflexes were absent, and there was a loss of sensation in the right upper extremity. (Tr. 484). On the other hand, range of motion of the cervical spine was normal, grip and grasp were normal and there was no evidence of muscle atrophy. (Tr. 484-484). There was elevated blood. (Tr. 483). Significantly, Fritzhand did not address physical functional capacity, so that it is difficult for the layman to assess the impact of these findings and the Court must pass on to the other contemporaneous evidence.

The ALJ maintained that Fritzhand's findings were consistent with treating physicians' records. The plaintiff's new primary treating physician in 2001 and 2002, Dr. Jeffery Golden, did report bone scan evidence of "moderate to marked osteopenia in the lumbar spine (Tr. 604), complaints of arm, shoulder or low back pain (e.g., Tr. 604, 613, 617), a restricted range of motion of the neck (Tr. 607, 609),

tenderness of the lumbar spine (Tr. 608, 610, 612, 613), tenderness of the right arm

(Tr. 609) or knees (Tr. 610) and trigger points in the cervical and thoracic regions

(Tr. 610). On the other hand, the doctor noted that pulses were good (as could

reflect upon thoracic outlet syndrome) and that the plaintiff's complaints were

essentially linked to overhead activities. (E.g., Tr. 607, 609). The doctor

emphasized in the progress note that he had not treated her when she was

disabled (Tr. 609) and did not issue his own detailed functional capacity

assessment. A specialist, Dr. El-Naggar, discovered a compression fracture of the

end plate of L2 since a 2002 accident (Tr. 623). The plaintiff was later said to

exhibit tenderness in the lower thoracic and upper lumbar region, with studies

revealing mild kyphoses at L1-2 as well as the fracture (Tr. 621). However, the

doctor issued no functional capacity assessment and even recommended that she

discontinue narcotic pain medication as of January, 2003. (Tr. 619). His colleague,

Dr. Magdy El-Kalliny, observed later in the year that the patient was neurologically

intact as far as low back complaints. While the ALJ's statement about fully

"consistent" findings vis-a-vis Fritzhand may or may not be the case, none of these

treating doctors (except for Golden in his brief reference to overhead reaching)

made a detailed functional capacity analysis, which leaves the current, detailed

functional capacity forms from the medical reviewers (Tr. 537-547, 578-585) as the

most appropriate information during the current period. Given the fact that the last

8

Watts

medical reviewer physical capacity assessment (Tr. 578-585)[3] was cited to the VE (Tr. 672), who indicated that she could perform her past work and other jobs, this was adequate for an assessment of Watts' improved physical capacity.

The Court acknowledges the plaintiff's argument that her mental status was not appropriately considered. Since this condition did not form even a partial basis for the original award of benefits, it was not subject to a medical improvement standard. Moreover, substantial evidence supported a finding that there were no permanent mental limitations for the period around and after the contemplated benefits cut-off date. The plaintiff was not referred for specialist treatment and, but for Dr. Gatschenberger whom the plaintiff has discredited, was not examined by a mental health specialist. Dr. Golden referred to the plaintiff's mental condition as "stable" and cited no functional capacity limitations.

Medical improvement was established to exist, and the current evidence relating to the plaintiff's status does not imply greater limits than the ALJ cited to the vocational expert. The decision will be affirmed.

This the _____23_____ day of June, 2005.

G. WIX UNTHANK
SENIOR JUDGE

---

[3]Significantly, the reviewer's assessment contained a restriction on overhead reaching (Tr. 581), which also addressed Golden's concern.

9